1

2

3

4                          UNITED STATES DISTRICT COURT

5                        NORTHERN DISTRICT OF CALIFORNIA

6

7    CATLIN INSURANCE COMPANY, INC.,          Case No. 20-cv-01345-HSG

8                    Plaintiff,               **ORDER GRANTING PLAINTIFF'S**
                                              **MOTION FOR SUMMARY**
9            v.                               **JUDGMENT**

10   DANKO MEREDITH,                          Re: Dkt. No. 35

11                   Defendant.

12

13          Pending before the Court is Plaintiff Catlin Insurance Company, Inc's motion for summary

14   judgment. Dkt. No. 35. The Court heard argument on the motion. For the reasons detailed

15   below, the Court **GRANTS** the motion.

16   **I.    BACKGROUND**

17          Plaintiff Catlin Insurance Company, Inc. filed this action to recover a duplicative

18   settlement payment that it made in connection with an underlying lawsuit in California state court.

19   *See* Dkt. No. 14 ("FAC").

20          The facts of this case are largely undisputed. Following a plane crash in July 2012,

21   Defendant Danko Meredith represented the heirs of one of the decedents, Michael Boolen, in a

22   wrongful death action. *See* Dkt. No. 36-1 ("Danko Decl.") at ¶ 2; *see also id.* at Ex. A. The heirs

23   sued Able Air Corporation, an aircraft maintenance facility, in California state court. *Id.* The

24   heirs claimed that the plane had been negligently maintained and operated, leading to the crash.

25   *See* Danko Decl., Ex. A. Plaintiff Catlin Insurance[1] provided liability insurance coverage for Able

26   _____

27   [1] During the hearing, Plaintiff clarified that there are other related entities—"AXA XL" and "XL
     Catlin"—involved in the underlying litigation. Nevertheless, because Plaintiff paid the duplicative
28   $180,000 and now seeks its return, any distinctions among the other entities do not appear relevant
     for purposes of this motion. The Court therefore refers to these entities throughout as "Plaintiff"

United States District Court
Northern District of California

1    Air to defend itself in the litigation.  *See* Dkt. No. 35-2 ("Breitenbach Decl.") at ¶ 3.  In October

2    2017, Able Air settled with one of the heirs, LaVerne Boolen.  *See id.* at ¶ 5.  Defendant provided

3    a statutory offer to compromise for $180,000, which Ms. Boolen signed on October 3, 2017.  *See*

4    Dank Decl., Ex. B.  The settlement was subsequently memorialized in a written agreement, dated

5    March 5, 2018 ("Release of Claims").  *See id.*; Dkt. No. 35-3 ("Hanson Decl."), Ex. A.  In the

6    Release of Claims, Ms. Boolen agreed to:

> release[] all claims and damages against [Able Air and Catlin
> Insurance] arising or to arise on account of . . . [c]laims and damages
> arising out of the certain incident occurring on July 5, 2012, [and as
> described more fully in the state court complaint].

*See* Hanson Decl., Ex. A at 2.  The agreement further stated that it is:

> the intent of this agreement to fully compromise any all claims which
> [Ms. Boolen] now has or may hereafter acquire in any manner by
> reason of or even remotely arising out of the incident . . . .

*Id.* at 3.  In exchange, Able Air and Catlin Insurance agreed to pay Plaintiff $180,000.  *Id.* at 1.

According to Defendant, Able Air and Catlin Insurance did not pay, and Ms. Boolen

moved to enforce the settlement under California Code of Civil Procedure § 664.6.  *See* Danko

Decl. at ¶ 5.  On April 27, 2018, Defendant sent an email saying that it would draft a complaint for

breach of contract if the settlement funds were not promptly transferred.  *See* Dkt. No. 35-1, Ex. A

at 24.  Defendant asserts that at the time it believed Ms. Boolen therefore had "potential claims

against Able Air and its insurer for breach of contract, unfair business practices, and intentional

infliction of emotional distress given the actions of Catlin and/or its insured, Able Air."  *See*

Danko Decl. at ¶ 7.

Regardless, on April 30, 2018, Plaintiff wired the settlement payment in the amount of

$180,000 to Defendant's client trust account.  *See* Breitenbach Decl., Ex. B.  Wells Fargo also

confirmed that day that the $180,000 wire transfer was successfully processed.  *See id.*, Ex. C.

_____

or "Catlin."

United States District Court
Northern District of California

The "Originator to Beneficiary Information" listed on the wire transfer stated "LaVerne Boolen settlement." *Id.*, Ex. B.  Two days later, on May 2, 2018, Plaintiff sent Defendant a check, also in the amount of $180,000, made out to "Danko Meredith Client Trust Account."  *See id.*, Ex. D.  The check did not include a reference to Ms. Boolen or the settlement.  Plaintiff explains that this check was not authorized and was sent in error.  *See id.* at ¶ 9.  Plaintiff further explains that the mistake was the result of a design limitation in the company's financing software.  *See* Danko Decl., Ex. F at 43:4–45:22.  When a wire transfer is made, someone in finance must then manually update the system to convert the entry to an "accounting entry" in order to prevent a check from being issued automatically.  *See id.*

Defendant appears to concede that it received this duplicative payment.  *See* Dkt. No. 36 at 1 ("Catlin paid money to Laverne Boolen.  Then it paid the money again.").  Shawn Miller, an attorney at Danko Meredith, testified that he and Michael Danko, another attorney at the firm, were initially confused about why Plaintiff sent the check. *See* Dkt. No. 35-1, Ex. A ("Miller Depo.") at 24:20–25:8, 26:8–27:1, 33:6–16.  Mr. Miller recalled learning that it was a duplicative payment—and not just a record of the wire transfer—in May or June 2018.  *See id.*

In the interim, the underlying action proceeded to trial on behalf of the remaining heirs on June 18, 2018.  *See* Dkt. No. 35 at 2.  Because she had settled her claims, Ms. Boolen did not pursue any claims at the trial.  *See* Hanson Decl. at ¶ 9; *see also* Miller Depo. at 33:17–34:3, 34:17–35:4.  The jury returned a defense verdict, though the heirs indicated that they would appeal.  *See* Breitenbach Decl. at ¶ 11.  The parties subsequently entered into a global settlement agreement, which included Ms. Boolen, the other heirs, Able Air, and Plaintiff.  *See* Danko Decl., Ex. C ("Mutual Waiver Agreement").  In the Mutual Waiver Agreement, the heirs agreed to waive their rights to appeal the judgment from trial, as well as any post-trial litigation arising from the jury trial and plane crash.  *See id.* at 1–2.  They further agreed that the plane wreckage could be destroyed.  *See id.* at 2.  Able Air and Catlin, in turn, agreed to waive the right to recover any and all costs claimed in its cost bill.  *Id.*

As relevant to this motion, the Mutual Waiver Agreement also included language that the agreement constituted:

> a full and final and complete waiver and discharge of all claims of every sort and nature whether arising in law or equity that might or could be made on account of or resulting from matters litigated in the jury trial that commenced on June 18, 2018, the incident [plane crash] occurring on July 5, 2012 and matters described herein.

*Id.* at 2.  The parties also waived California Civil Code § 1542, which states:

> A general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor.

*Id.*  The Mutual Waiver Agreement was signed between December 2018 and February 2019.  *Id.*

Months later, in July 2019, Plaintiff's accounting department notified Mark Breitenbach, a practice leader in Plaintiff's aviation program, that Catlin had sent a duplicative payment to Defendant.  *See* Breitenbach Decl. at ¶¶ 12–13; *see also* Danko Decl., Ex. F at 59:1–63:13.  Mr. Breitenbach, in turn, notified Catlin's attorney John Hanson about the payment.  *See* Breitenbach Decl. at ¶ 13.  Mr. Hanson then contacted Defendant and requested the return of the duplicative payment.  *See* Hanson Decl. at ¶ 5, & Ex. B.  Defendant refused to return the funds.  *See id.* at ¶¶ 6–7, & Ex. C.  Mr. Danko, citing the Mutual Waiver Agreement, stated simply that "[t]he parties having mutually waived and discharged all claims they had or could have against one another, this case is now closed."  *See id.*, Ex. C.

Based on these facts, Plaintiff initially brought three causes of action against Defendant: (1) unjust enrichment; (2) conversion; and (3) breach of fiduciary duty.  *See* FAC at ¶¶ 22–34.  The Court dismissed the fiduciary duty claim, *see* Dkt. No. 28, so unjust enrichment and conversion are the only causes of action that remain.  Plaintiff now moves for summary judgment as to both causes of action.  Dkt. No. 35.

## II.    LEGAL STANDARD

Summary judgment is proper when a "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is "material" if it "might affect the outcome of the suit under the governing law."  *Anderson*

United States District Court
Northern District of California

1    *v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute is "genuine" if there is evidence in the

2    record sufficient for a reasonable trier of fact to decide in favor of the nonmoving party.  *Id.*  The

3    Court views the inferences reasonably drawn from the materials in the record in the light most

4    favorable to the nonmoving party, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S.

5    574, 587–88 (1986), and "may not weigh the evidence or make credibility determinations,"

6    *Freeman v. Arpaio*, 125 F.3d 732, 735 (9th Cir. 1997), *overruled on other grounds by Shakur v.*

7    *Schriro*, 514 F.3d 878, 884–85 (9th Cir. 2008).

8    The moving party bears both the ultimate burden of persuasion and the initial burden of

9    producing those portions of the pleadings, discovery, and affidavits that show the absence of a

10   genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Where the

11   moving party will not bear the burden of proof on an issue at trial, it "must either produce

12   evidence negating an essential element of the nonmoving party's claim or defense or show that the

13   nonmoving party does not have enough evidence of an essential element to carry its ultimate

14   burden of persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102

15   (9th Cir. 2000).  Where the moving party will bear the burden of proof on an issue at trial, it must

16   also show that no reasonable trier of fact could not find in its favor.  *Celotex Corp.*, 477 U.S. at

17   325.  In either case, the movant "may not require the nonmoving party to produce evidence

18   supporting its claim or defense simply by saying that the nonmoving party has no such evidence."

19   *Nissan Fire & Marine Ins. Co.*, 210 F.3d at 1105.  "If a moving party fails to carry its initial

20   burden of production, the nonmoving party has no obligation to produce anything, even if the

21   nonmoving party would have the ultimate burden of persuasion at trial." *Id.* at 1102–03.

22   "If, however, a moving party carries its burden of production, the nonmoving party must

23   produce evidence to support its claim or defense." *Id.* at 1103. In doing so, the nonmoving party

24   "must do more than simply show that there is some metaphysical doubt as to the material facts."

25   *Matsushita Elec. Indus. Co.*, 475 U.S. at 586.  A nonmoving party must also "identify with

26   reasonable particularity the evidence that precludes summary judgment." *Keenan v. Allan*, 91

27   F.3d 1275, 1279 (9th Cir. 1996).  If a nonmoving party fails to produce evidence that supports its

28   claim or defense, courts enter summary judgment in favor of the movant.  *Celotex Corp.*, 477 U.S.

at 323.

## III.   DISCUSSION

As noted above, the undisputed evidence shows that (1) Able Air entered into a settlement with Ms. Boolen for $180,000 to settle her claims related to the plane crash; (2) Plaintiff made two $180,000 payments to Defendant's client trust account  (*i.e.*, payments totaling $360,000); (3) Defendant was aware of the duplicative payment but did not alert Plaintiff or return it; (4) Plaintiff requested the return of the duplicative payment; and (5) Defendant refused.

### A.   Conversion

Under California law, conversion is "the wrongful exercise of dominion over the property of another." *Lee v. Hanley*, 61 Cal. 4th 1225, 1240 (Cal. 2015) (quotations omitted).  To succeed on a claim for conversion, a plaintiff must establish:  "(1) the plaintiff's ownership or right to possession of the property; (2) the defendant's conversion by a wrongful act or disposition of property rights; and (3) damages." *Id.* (quotations omitted).  "It is not necessary that there be a manual taking of the property; it is only necessary to show an assumption of control or ownership over the property, or that the alleged converter has applied the property to his own use." *See Shopoff & Cavallo LLP v. Hyon*, 167 Cal. App. 4th 1489, 1507 (Cal. Ct. App. 2008).

Defendant contends that Plaintiff has not provided sufficient evidence that Defendant had possession of or control over the duplicative payment. *See* Dkt. No. 36 at 15–16.  Yet Defendant agrees that the funds were sent to and deposited in Defendant's client trust account. *Id.* at 16.  Nevertheless, Defendant seems to suggest that because the funds were in a client trust account, Defendant lacked "unfettered control or possession of the money." *See* Dkt. No. 36 at 16.  This is nonsensical and unsupported by the record.  The undisputed evidence illustrates that the duplicative check was made out to "*Danko Meredith* Client Trust Account," and deposited in *Danko Meredith*'s account. *See* Breitenbach Decl., Ex. D (emphasis added).  Defendant suggests that California Rule of Professional Conduct 1.15 somehow shows that it lacks adequate control or possession over funds in a client trust account. *See* Dkt. No. 36 at 16.  The Court disagrees.

Defendant is correct, as far as it goes, that a client trust account is an express trust "whereby a trustee holds property for another's benefit." *Prakashpalan v. Engstrom, Lipscomb &*

United States District Court
Northern District of California

*Lack*, 223 Cal. App. 4th 1105, 1123 (Cal. Ct. App. 2014), *as modified on denial of reh'g* (Feb. 27, 2014).  California Rule of Professional Conduct 1.15(a) states:

> All funds received or held by a lawyer or law firm* for the benefit of a client, or other person* to whom the lawyer owes a contractual, statutory, or other legal duty, including advances for fees, costs and expenses, shall be deposited in one or more identifiable bank accounts labeled "Trust Account" or words of similar import, maintained in the State of California, or, with written* consent of the client, in any other jurisdiction where there is a substantial* relationship between the client or the client's business and the other jurisdiction.

Cal. Rules of Prof. Conduct, Rule 1.15(a).  And Rule 1.15(c) states that "funds belonging to the lawyer or the law firm* shall not be deposited or otherwise commingled with funds held in a trust account . . . ."  *See id.* at Rule 1.15(c).  But this Rule does not eliminate Defendant's control over the account or the funds contained within it.  To the contrary, Rule 1.15 highlights the control that a lawyer has—and is obligated to exercise—over client trust accounts.  Rule 1.15(c) explains, for example, that if there are funds belonging to the lawyer in the client trust account, that "portion belonging to the lawyer or law firm* must be withdrawn at the earliest reasonable* time after the lawyer or law firm's interest in that portion becomes fixed."  *See id.* at Rule 1.15(c)(1)(2).  A lawyer must also "promptly distribute, as requested by the client or other person,* any undisputed funds or property in the possession of the lawyer or law firm* that the client or other person* is entitled to receive."  *Id.* at Rule 1.15(d)(7).  But nothing in the Rules of Professional Conduct requires or permits a lawyer to retain funds in a client trust account or distribute them to a client if the lawyer or client are not legally entitled to those funds.

Defendant also cites to a declaration from Michael Danko that "[n]either Danko Meredith nor I have received any portion of the funds represented by the at-issue payment."  *See* Danko Decl. at ¶ 16.  But this does not create a factual dispute about whether Defendant had control over its own client trust account when the funds were deposited there.  Defendant did not have to use the $180,000 for its own benefit to have wrongly converted Plaintiff's money.  Neither does Defendant have to currently retain the funds.  There is no evidence in the discovery record as to whether the funds remain the client trust account or whether Defendant disbursed them to Ms.

United States District Court
Northern District of California

1   Boolen.  During the hearing, however, counsel acknowledged the funds remain in the client trust

2   account.  In any event, the current location of the funds is irrelevant.  Defendant may be "liable for

3   conversion for simply refusing to return an identifiable sum of [Plaintiff's] money."  *Lee*, 61 Cal.

4   4th at 1240.  Here, the undisputed evidence in the record establishes that Plaintiff requested that

5   Defendant return the funds, and Defendant refused.  *Cf. Semiconductor Components Indus., L.L.C.*

6   *v. I2A Techs., Inc.*, No. C10-0603 TEH, 2010 WL 3036731, at *4 (N.D. Cal. July 30, 2010)

7   (granting judgment on pleadings for conversion and unjust enrichment where plaintiff transferred

8   more money than owed the defendant, rejecting argument that "a party who receives funds by

9   mistake from another party may decide when and on what terms to return those funds").  The

10   Court therefore finds that there are no disputes of material fact precluding summary judgment in

11   favor of Plaintiff on its conversion claim.

12          **B.      Unjust Enrichment**

13          Defendant raises several arguments as to why summary judgment is not warranted as to

14   Plaintiff's unjust enrichment claim.  *See* Dkt. No. 36 at 6–15.

15          As an initial matter, Defendant suggests that unjust enrichment is not a freestanding claim

16   and therefore fails because Plaintiff "has not sued for recission and restitution."  *See* Dkt. No. 36 at

17   6.  The Ninth Circuit "has construed the common law to allow an unjust enrichment cause of

18   action through quasi-contract."  *ESG Capital Partners, LP v. Stratos*, 828 F.3d 1023, 1038 (9th

19   Cir. 2016); *see also Astiana v. Hain Celestial Grp., Inc.*, 783 F.3d 753, 762 (9th Cir. 2015)

20   ("When a plaintiff alleges unjust enrichment, a court may construe the cause of action as a quasi-

21   contract claim seeking restitution." (quotations omitted)).  And here, Plaintiff alleged that

22   "Defendants owe Plaintiff a duty to make restitution."  FAC ¶ 26.  The Court therefore turns to the

23   merits of the claim.

24          To establish a claim for unjust enrichment, "a plaintiff must show that the defendant

25   received and unjustly retained a benefit at the plaintiff's expense."  *ESG Capital Partners*, 828

26   F.3d at 1038.  Defendant contends that it was not enriched, and that any failure to return the

27   duplicative payment was not unjust.  As to whether Defendant benefited from the retention of the

28   $180,000, Defendant asserts that there is no evidence in the record that it "has withdrawn from the

Trust account for its own purposes or in any fashion received any portion of the payment at issue." *See* Dkt. No. 36 at 7.  But as explained above, the record establishes that a duplicative payment of $180,000 was sent to and deposited in *Defendant's* client trust account.   As the California Supreme Court succinctly explained, "[t]he term 'benefit' denotes any form of advantage." *Ghirardo v. Antonioli*, 14 Cal. 4th 39, 51 (Cal. 1996) (quotation omitted).  The receipt of money is a benefit.  As discussed above, the record shows that Defendant received a $180,000 check in its client trust account, it could control these funds, and in exerting this control, it refused to return the money to Plaintiff.

To the extent Defendant suggested in its briefing that the money is no longer in its client trust account because Defendant distributed it to Ms. Boolen, Defendant has not proffered any evidence that the money does not remain in its account.  As mentioned above, during the hearing on the motion Defendant explained that no discovery was taken on this issue, but confirmed that the funds remain in its client trust account.  But even if Defendant had distributed the money to its client, the goodwill Defendant would no doubt receive from providing such a windfall to its client is still a benefit.

Defendant next contends that retaining the duplicative payment was not unjust because Plaintiff waived its right to return of the payment under the Mutual Waiver Agreement.  *See* Dkt. No. 36 at 8–15.  "Even when a person has received a benefit from another, he is required to make restitution only if the circumstances of its receipt or retention are such that, as between the two persons, it is unjust for him to retain it." *Ghirardo*, 14 Cal. 4th at 51.  Defendant's reliance on the Mutual Waiver Agreement, however, is misplaced.

*First*, Defendant was not a party to the agreement.  *See* Danko Decl., Ex. C.  Although Michael Danko signed the agreement, it was only to "approve[]" it "as to form and content" as Ms. Boolen's attorney.  *See id.* at 4.  By the plain terms of the Mutual Waiver Agreement, only Able Air, Catlin, Ms. Boolen, and the other heirs agreed to waive any claims.  *Id.*  Neither Catlin nor Danko Meredith agreed to give up any claims *against each other* as part of the Mutual Waiver Agreement.  *Id.*  Defendant's suggestion that it was "arguably a party to the Mutual Waiver," *see* Dkt. No. 36 at 12, is not supported by any authority and contrary to the plain language of the

United States District Court
Northern District of California

1   agreement.  The "Defendant" for purposes of the Mutual Waiver Agreement is defined as Able

2   Air, "its employees, agents, assigns, [and] legal representatives . . . including XL Catlin."  *See*

3   Danko Decl., Ex. C at 1.  Had the parties intended for the "Plaintiffs" under the Mutual Waiver

4   Agreement to include Danko Meredith, they could have said so explicitly by listing Danko

5   Meredith, or at least referencing the agents or legal representatives of the plaintiffs in the

6   underlying case.  The agreement did not do so.  Defendant's unsupported suggestion that it is a

7   party to the Mutual Waiver Agreement is insufficient to raise a triable issue of fact.

8        *Second*, any claim for the return of the duplicative payment does not fall within the plain

9   meaning of the Mutual Waiver Agreement.  Under the agreement, the parties waived all claims

10  "that might or could be made on account of or resulting from matters litigated in the jury trial that

11  commenced on June 18, 2018, the incident [plane crash] occurring on July 5, 2012 and matters

12  described herein."  *See id.* at 2.  Defendant argues that this language is not ambiguous.  *See* Dkt.

13  No. 36 at 8–9.  The Court agrees.  But Plaintiff's claims to return the duplicative payment were

14  not made on account of or resulting from matters litigated in the jury trial.  Neither Ms. Boolen's

15  claims nor the distribution of a duplicative $180,000 check were discussed at all during the jury

16  trial.  *See* Miller Depo. at 33:17–345:4.  Plaintiff's claims to return the duplicative payment were

17  also not made on account of or arising from the plane crash.  As Defendant acknowledges, the

18  agreement with Ms. Boolen that related to the plane crash was for the payment of only $180,000.

19  *See id.* at 33:6–16, 54:19–55:20.  At no time did Able Air or Plaintiff agree to pay an additional

20  $180,000 to either Ms. Boolen or Defendant.  *See id.*  The second $180,000 check was an

21  accounting error made before trial and before the Mutual Waiver Agreement.  *See* Danko Decl.,

22  Ex. F at 43:4–45:22.  There is no plausible reading of the Mutual Waiver Agreement in which

23  Plaintiff waived its right to correct an internal accounting error.

24        Defendant appears to suggest that Plaintiff should be suing Ms. Boolen, who is a party to

25  the Mutual Waiver Agreement, and not Defendant.  *See* Dkt. No. 36 at 5.  But the parties agree

26  that Ms. Boolen was not entitled to another $180,000 payment from Plaintiff.  *See* Miller Depo. at

27  33:6–16, 54:19–55:20.  The $180,000 check was made out to the "Danko Meredith Client Trust

28  Account," and did not even reference the settlement with Ms. Boolen.  *See* Breitenbach Decl., Ex.

D.  And Defendant acknowledges that these funds were deposited in its account.  *See, e.g.*, Dkt. No. 36 at 7–8.  There is no evidence in the record that Ms. Boolen was even aware of this money, let alone that she received it.  As noted above, Defendant confirmed during the hearing that the funds remain in its client trust account.  Plaintiff therefore sued the party who had control over the duplicative payment.

When determining whether the retention of the duplicative payment was unjust, the Court returns to the undisputed facts of this case:  Defendant knew as early as May or June 2018 about the duplicative payment and said nothing to Plaintiff.  Although acknowledging that the payment was sent in error, Defendant refused to return it.  Courts applying California law have found that "restitution may be required when the person benefitting from another's mistake knew about the mistake and the circumstances surrounding the unjust enrichment."  *See, e.g.*, *First Nationwide Sav. v. Perry*, 11 Cal. App. 4th 1657, 1664 (Cal. Ct. App. 1992).  That is precisely what happened here.  Defendant knew about Plaintiff's mistake and attempted to benefit from it.

During the hearing, Defendant suggested that its decision not to alert Plaintiff of the mistaken payment was supported by an opinion from the Los Angeles County Bar Association's Professional Responsibility and Ethics Committee.[2]  But that opinion is factually distinct because the overpayment there was made directly to the client rather than the attorney.  In any event, the opinion states that under such circumstances, "[t]he attorney should counsel the client to disclose and return the overpayment."  And if the client refuses, "the attorney must consider whether the failure to disclose constitutes fraud" and whether he or she must withdraw from the representation. The opinion does not suggest, let alone require, that an attorney may keep an overpayment that is sent directly to its own client trust account.

The Court finds that there are no disputes of material fact precluding summary judgment in favor of Plaintiff on its unjust enrichment claim.

//

---

[2] *Duty to Inform Adverse Party Regarding Erroneous Settlement Payment*, Opinion No. 520, Los Angeles County Bar Association Professional Responsibility and Ethics Committee, (June 18, 2007), https://www.lacba.org/resources/ethics-opinions.

11

United States District Court
Northern District of California

1

## IV.    CONCLUSION

Accordingly, the Court **GRANTS** the motion for summary judgment.  During the hearing on the motion Plaintiff clarified that it is only seeking the return of the $180,000 and waives any other request for attorneys' fees or further damages.  The Clerk is therefore directed to enter judgment in favor of Plaintiff in the amount of $180,000 and to close the case.

**IT IS SO ORDERED.**

Dated:  12/20/2021

HAYWOOD S. GILLIAM, JR.
United States District Judge

12